**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COURIER NETWORK INC., COURIER NETWORK VIETNAM CO., LTD., | ) | |
| Plaintiffs, | ) | C.A. No. ____________ |
| v. | ) | **JURY TRIAL DEMANDED** |
| AIRSPACE TECHNOLOGIES, INC., | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs Courier NetWork Inc. and Courier NetWork Vietnam Co., Ltd. (collectively "CNW") for their Complaint against Defendant Airspace Technologies, Inc. ("Airspace"), allege as follows:

**INTRODUCTION**

1. CNW is a same-day international and domestic courier service that works with a select cadre of Fortune 500 companies to reliably ship urgent packages quickly, safely and cost-effectively. CNW harnesses its sophisticated proprietary logistics operations to deliver packages at breakneck speed – faster than any other logistics company on earth. It is a family-owned New York company that has been in business for nearly forty years.

2. Airspace is an expedited shipping start-up backed by a fortune in private equity. This action arises out of a persistent targeted wrongful campaign by Airspace to gain access to CNW's proprietary methods of doing business and its client list. Airspace seeks to copy CNW's proprietary logistics operations, but it has no legal right to do so. Airspace has been relentlessly pursuing CNW's employees for purposes of wrongfully mining them for CNW's trade secret

business methods and client names. Airspace successfully gained access to CNW's trade secrets from the former CNW employees that it hired and is actively misusing those trade secrets to unfairly compete against CNW in the marketplace. In addition, Airspace has tortiously interfered with CNW's contracts with its former employees, which Airspace knows prohibit them from disclosing CNW's confidential information and from soliciting CNW's key customers and employees for a reasonable amount of time.

3. CNW brings this action against Airspace for misappropriation of trade secrets, in violation of the federal Defend Trade Secret Act and state law, and tortious interference with contract.

## PARTIES

4. Plaintiff Courier NetWork Inc. is a New York corporation with its principal place of business in Miami, Florida.

5. Plaintiff Courier NetWork Vietnam Co., Ltd. is a Vietnam company with its principal place of business in Ho Chi Minh City, Vietnam.

6. Defendant Airspace is a Delaware corporation with its principal place of business in Carlsbad, California.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367(a).

8. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity between the parties, who are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9. This Court has general personal jurisdiction over Defendant Airspace, which is a Delaware citizen.

10. Venue is appropriate in this District, pursuant to 28 U.S.C. § 1391(b)(1), because Defendant Airspace, a Delaware corporation, resides in this District.

**STATEMENT OF FACTS**

11. Airspace was founded in 2016-17 by Nick Bulcao and Ryan Rusnak. Between 2018 and 2023, Airspace raised approximately $138 million in venture capital to fund its operations.

12. Instead of using this treasure trove of private equity money to develop its own operations plans and customer base, Airspace has focused on gaining access to CNW's business methods and copying those business methods to lure away CNW's key customers. Airspace has targeted CNW's employees, offering them rich pay packages to move to Airspace, where Airspace pumps them for details on CNW's "secret sauce" and confidential customer relationships.

13. Currently, five former CNW employees work at Airspace. Over Airspace's short life-span, it has doggedly pursued CNW's most valuable employees, including at least seven employees who declined Airspace's recruitment efforts and remain at CNW. These aggressive recruiting efforts are out of the ordinary for the expedited shipping industry. It represents a calculated and concerted effort by Airspace to gain wrongful access to CNW's trade secrets, know-how and client list through acquisition of CNW's workforce. Airspace has shown that it is willing to do anything and everything to attempt to wrest away CNW's customers, including but not limited to approaching those customers to offer them shipping services on terms that make no economic sense.

14. In April 2024, Airspace hired a former CNW employee in Vietnam, Nguyen Thi Chau Duong, who had been CNW's Country Manager in Vietnam. Duong is subject to post-termination confidentiality, non-solicitation and non-competition obligations. In violation of those obligations, Duong is actively using CNW's confidential information to solicit customers that she worked with at CNW. Two substantial accounts that collectively do more than $1.5 million in annual business with CNW reported to CNW that they had been approached by Duong to move their CNW expedited shipping business to Airspace. This former employee misappropriated and misused CNW trade secrets concerning those clients' business in making those solicitations on Airspace's behalf. CNW has repeatedly demanded that Airspace and the former employee cease this wrongful conduct. They have refused. Duong continues to pursue CNW's customers on Airspace's behalf, wrongfully relying upon CNW's trade secret information, inclusive of its confidential customer lists.

15. In January 2025, Airspace hired Kevin Volpe, CNW's Senior Director of Key Accounts. Volpe's last day at CNW was January 24, 2025.

16. Volpe had worked at CNW since 2016. During the more than eight years that Volpe was employed by CNW, he was trained on its shipment operations, rates and terms of service, suppliers, routings, business policies, finances and business plans, customized software, marketing tools and supplies and the techniques, methods and strategies by which CNW develops, markets, distributes and sells its services. As part of Volpe's job responsibilities, he assisted in setting the account terms and pricing of sales contracts between CNW and its largest customers. Among other things, he was charged with marketing and selling CNW's services, as well as with supporting CNW's premier clientele. CNW's core customer base came to trust and rely upon Volpe.

17. CNW invested significant resources in training Volpe on its proprietary business model and entrusted him with responsibility for its most valuable key accounts. Volpe was privy to every aspect of the business, including trade secret logistics, operating costs, profit margins, bidding procedures, each key account's unique needs, and CNW's highly valuable confidential roster of key accounts. That customer list is a closely guarded trade secret. Volpe had responsibility for more than 25 key accounts that make up a significant portion of CNW's revenue. CNW's most valuable relationships have persisted for 20 years or more.

18. In Volpe's performance of his job duties at CNW, he became familiar with its other employees. He gained a deep understanding of which employees are most valuable to CNW's operations and hold a trove of CNW's trade secret information.

19. Over the course of the eight years that Volpe worked at CNW, Volpe was promoted and given regular salary increases. Volpe was one of CNW's most highly compensated employees. Airspace had previously tried to hire Volpe in 2022. When Volpe approached CNW with that earlier job opportunity, CNW increased Volpe's compensation in order to retain him.

20. Volpe orally tendered his resignation on January 9, 2025. He informed CNW that he had been offered a key accounts job at Airspace. This time, Volpe was not interested in any counter-offer from CNW.

21. On December 29, 2016, in consideration of his employment as a Key Account Manager in the U.S., Volpe entered into a Confidentiality and Non-Solicitation Agreement with CNW. That agreement is governed by New York law. It serves the purpose of safeguarding CNW's highly valuable employees, trade secrets and customer base. The agreement prohibits Volpe, a New York resident who currently works from his home in New York City, from

soliciting CNW employees and CNW customers for one year following the termination of his employment. In addition, the agreement explicitly prohibits Volpe from divulging CNW's confidential information, inclusive of its valuable trade secrets.

22. On January 10, 2025, CNW's counsel sent a letter to Volpe and Airspace providing detail on Volpe's obligations to CNW, including his confidentiality and non-solicitation obligations. Among other things, the letter enumerated CNW's confidential information, which includes *inter alia*, (a) customer lists; (b) rates and terms of service; (c) suppliers; (d) shipment operations; (e) routings; (f) business policies, finances and business plans; (g) financial projections; (h) customized software, marketing tools and supplies; (i) account terms and pricing of sales contracts between CNW and its customers; (j) names and addresses of CNW employees and other business contacts of CNW; and (k) the techniques, methods and strategies by which CNW develops, markets, distributes and sells its services. CNW notified Volpe and Airspace that Volpe is prohibited from using, relying upon or disclosing CNW's confidential information. It also notified Airspace and Volpe that Volpe is prohibited from directly or indirectly soliciting CNW's customers or employees for one year's time.

23. Notwithstanding the express notice that CNW provided to Volpe and Airspace of Volpe's non-solicitation obligations, on February 11, 2025, Volpe (acting as an agent of Airspace) approached a CNW employee asking whether he would be interested in leaving CNW. The employee provided CNW with a screen-shot of a solicitation message that Volpe sent to him on LinkedIn. This employee is an Operations Supervisor at CNW responsible for overseeing operations and ensuring timely and efficient handling of packages. This employee is a crucial logistics operator who supports CNW's key accounts and has intimate knowledge of CNW's

proprietary business model for expedited delivery solutions. He leads CNW's team of operators. On information and belief, in order to obtain authority to solicit this individual to leave CNW for Airspace, Volpe must have informed Airspace of his importance to CNW's operations, which is a violation of Volpe's trade secret and confidentiality obligations.

24. Volpe also is soliciting CNW's key accounts. CNW has information showing that Airspace enlisted Volpe to continue to work with a specific CNW customer in the semiconductor business that Volpe had serviced at CNW. Volpe's involvement with that CNW customer on behalf of Airspace violates Volpe's obligation to refrain from directly or indirectly soliciting or attempting to solicit any business from any of CNW's customers with whom Volpe had contact during the last two years of his employment with CNW.

25. Volpe further admitted to CNW's counsel that he has been in touch with representatives of CNW's key accounts subsequent to the time that he was relieved of his key account responsibilities. Volpe complained to CNW's counsel about CNW's communications with its own customers, which had been relayed to him by those customers. Apparently, Volpe was unhappy that CNW had accurately informed its most valuable customers that Volpe was no longer acting as its Senior Director of Key Accounts. CNW was well within its rights to engage in those communications.

26. Based on Airspace's relentless efforts to poach CNW's customers, as well as CNW's knowledge that Volpe is in communication with CNW's customers, CNW reasonably believes that Volpe is directly and indirectly attempting to solicit business from numerous CNW customers for Airspace in violation of his non-solicitation obligations.

**PLAINTIFFS' TRADE SECRETS RELATING TO ITS LOGISTICS BUSINESS**

27. Volpe and Duong have deep knowledge of CNW's proprietary and trade secret information concerning the operation of its logistics business and CNW's most valuable expedited shipping customers. This information qualifies as trade secrets subject to protection under the law, including the Defend Trade Secret Act.

28. CNW took reasonable precautions to protect its trade secrets from disclosure. The trade secrets are not shared beyond those employees with a need to know them to perform their business duties. In addition, CNW's trade secret information requires password access to CNW's computer systems.

29. CNW's trade secrets include its client roster. CNW maintains that client list as a trade secret. CNW employees are required to sign confidentiality agreements in which they agree to keep the customer list and other proprietary information confidential. CNW also provides its employees with a company handbook that emphasizes the confidentiality of company clients, among other information. Employees are required to confirm receipt of the company handbook. The client list is not disclosed outside the company, unless the other party enters into a non-disclosure agreement. The list of companies that rely upon CNW's services for extremely expedited shipping is a valuable company asset. Moreover, it is an asset that CNW developed, nurtured and invested in.

30. On information and belief, Airspace wrongfully obtained details concerning CNW's trade secret client list from CNW's former employees.

31. CNW's trade secrets furthermore include (i) rates and terms of service; (ii) suppliers; (iii) shipment operations; (iv) routings; (v) business policies, finances and business plans; (vi) financial projections; (vii) customized software, marketing tools and supplies; (viii)

account terms and pricing of sales contracts between CNW and its customers; (ix) names and addresses of CNW employees and other business contacts of CNW; and (x) the techniques, methods and strategies by which CNW develops, markets, distributes and sells its services. All of this information is closely held. It has significant value to CNW. CNW's trade secrets have a value exceeding $500,000.

32. For example, the details of the specific expedited shipping needs and terms of service applicable to CNW's best customers is extremely valuable confidential information. That information includes pricing, CNW's profit margins, and how CNW manages its expedited shipping network to deliver packages at break-neck speed.

33. On information and belief, Airspace wrongfully obtained details concerning the specific expedited shipping needs and terms of service applicable to CNW's best customers from CNW's former employees.

34. On information and belief, Airspace wrongfully obtained additional CNW trade secret information from CNW's former employees.

## THE FORMER CNW EMPLOYEES' CONFIDENTIALITY OBLIGATIONS

35. CNW's former employees have continuing confidentiality obligations to CNW.

36. Volpe agreed that "following the termination of [his] employment for any reason, [he] shall not directly or indirectly divulge or make use of any Confidential Information or Trade Secrets." That confidential information includes, *inter alia*, information about the company's employees and customers, as well as the techniques, methods and strategies by which CNW develops, markets, distributes and/or sells its services.

37. Duong similarly agreed that, on termination of her employment with CNW, she would "immediately cease to use [CNW's] Confidential Information." That confidential

information includes, *inter alia*, commercial and technical information relating to CNW and its customers.

**THE FORMER CNW EMPLOYEES' NON-SOLICITATION OBLIGATIONS**

38. CNW's former employees have continuing non-solicitation obligations to CNW.

39. Volpe agreed that "during the term of [his] employment with the Company and for twelve (12) months after the termination thereof, regardless of the reason for the employment termination, [he] will not, directly or indirectly, on [his] own behalf or on behalf of or in conjunction with any person or legal entity, recruit, solicit, or induce, or attempt to recruit, solicit or induce any employee of the Company to terminate their employment relationship with the Company."

40. This provision barring solicitation of CNW employees is fully enforceable. This restrictive covenant serves to protect CNW's legitimate interests, does not impose undue hardship on Volpe, and is not injurious to the public. The covenant protects: (i) CNW's trade secrets; (ii) CNW's confidential customer information; (iii) CNW's client base; and (iv) against irreparable harm to CNW from the loss of employees whose services are unique and/or extraordinary.

41. The specific employee that CNW knows that Volpe solicited to leave CNW for Airspace possesses CNW trade secrets. He knows the details of the "secret sauce" supporting CNW's expedited shipping business. He also possesses CNW's confidential customer information. This employee works with CNW's most valued customers, smoothing the way for speedy delivery of their packages. He knows customer volume and their specialized needs. The potential loss of this employee to a direct competitor, such as Airspace, threatens disclosure of CNW's trade secrets and confidential customer information, which threatens CNW's client base.

Many of CNW's other employees are similarly situated, they have intimate knowledge of CNW's trade secrets and confidential customer information. This non-solicitation provision is specifically targeted to protect CNW's client base. Indeed, the departure of key personnel can start a chain reaction of client dissatisfaction, which harms CNW's valid interest in protecting its client base.

42. The current CNW employee Volpe solicited has special talents in import logistics, based on the investment CNW made in him and the skills that he developed during his time at CNW. Loss of his specialized services would disrupt the smooth operations of CNW's business, harm CNW's standing with its customers, and damage its goodwill. Many of CNW's other employees are similarly situated. They are highly trained in CNW's business needs, providing CNW with unique and extraordinary services. This non-solicitation provision is specifically targeted to protect CNW's relationship with these employees who provide it with unique and extraordinary services.

43. Volpe further agreed that "during the term of [his] employment with the Company and for twelve (12) months after the termination thereof, regardless of the reason for the employment termination, [he] will not, directly or indirectly, solicit or attempt to solicit any business from any of the Company's customers with whom [he] or the Company had contact during the last two (2) years of [his] employment with the Company."

44. Duong agreed in similar fashion that, for a period of 24 months from the date of the termination of her employment with CNW, she shall not solicit CNW customers.

45. These non-solicitation provisions are fully enforceable. The restraint (i) is no greater than required to protect CNW's legitimate interests in safeguarding its client relationships

and trade secrets; (ii) does not impose undue hardship on the former employees; and (iii) is not injurious to the public.

46. The non-solicitation provisions applicable to CNW's customers legitimately protect against misappropriation of CNW's confidential customer lists and other trade secrets.

47. Volpe and Duong breached their non-solicitation and confidentiality obligations to CNW.

48. Airspace induced Volpe and Duong to breach their non-solicitation and confidentiality obligations to CNW in furtherance of Airspace's business interests. Those breaches were executed on Airspace's behalf, for Airspace's benefit.

## CAUSES OF ACTION

### COUNT I
### (Trade Secret Misappropriation)

49. CNW repeats, realleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 48 as if fully set forth herein.

50. CNW possesses trade secrets relating to its expedited shipping business. Those trade secrets include, *inter alia*, its client list, rates and terms of service, shipment operations, account terms, and pricing of sales contracts between CNW and its customers and the techniques, methods and strategies by which CNW develops, markets, distributes and sells its services.

51. CNW took reasonable measures to maintain the secrecy of its trade secrets.

52. CNW's trade secrets maintain independent economic value from not being generally known to, and not being readily ascertainable through proper means. by another person who can obtain economic value from disclosure of the information.

53. Airspace wrongfully misappropriated CNW's trade secrets in violation of the Defense of Trade Secrets Act, 18 U.S.C. § 1836, as well as state law, and is improperly using CNW's trade secrets for Airspace's benefit. Airspace is using those trade secrets to attempt to lure away CNW's most valuable customers.

54. Airspace obtained CNW's trade secrets from CNW's former employees, including but not limited to Volpe and Duong.

55. Airspace discovered CNW's trade secrets by improper means, wrongfully obtaining them from former CNW employees with an obligation to maintain CNW's confidentiality.

56. Airspace willfully and maliciously misappropriated CNW's trade secrets.

57. CNW is being irreparably harmed by Airspace's misappropriation and misuse of its trade secrets to compete with CNW in the expedited shipping business.

58. CNW suffered actual losses from Airspace's misappropriation of its trade secrets.

59. Airspace has been unjustly enriched by misappropriation of CNW's trade secrets.

**COUNT II**
**(Tortious Interference with Contract)**

60. CNW repeats, realleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 59 as if fully set forth herein.

61. CNW has valid and enforceable confidentiality and non-solicitation agreements with Volpe and Duong.

62. Airspace was aware of those agreements. CNW specifically informed Airspace of its former employees' contractual obligations.

63. Airspace intentionally induced Volpe and Duong to breach those agreements.

64. Airspace encouraged Volpe and Duong to provide it with CNW's confidential information, including but not limited to confidential and proprietary information concerning CNW's clients, in violation of their agreements with CNW.

65. Airspace encouraged Volpe and Duong to misuse CNW's confidential information to solicit CNW customers to leave CNW for Airspace, or expand their business with Airspace, in violation of their agreements with CNW.

66. Airspace encouraged Volpe and Duong to directly and indirectly solicit and attempt to solicit CNW's customers on behalf of Airspace, in violation of their agreements with CNW.

67. Airspace encouraged Volpe to solicit CNW's unique and valuable employees to leave CNW for Airspace, in violation of his agreement with CNW.

68. Airspace's tortious interference with CNW's agreements with CNW's former employees caused actual damages to CNW.

69. Airspace's tortious interference with CNW's agreements with its former employees has caused irreparable harm to CNW, disrupting the smooth operation of its business, interfering with its relationships with its employees and impairing its goodwill.

**PRAYER FOR RELIEF**

WHEREFORE, CNW hereby demands judgment as follows:

i. Imposing a permanent injunction enjoining Airspace from possessing or making any use of CNW's misappropriated trade secrets;

ii. Awarding compensatory damages against Airspace;

iii. Awarding unjust enrichment damages against Airspace;

iv. Awarding punitive damages against Airspace;

v. Awarding CNW its attorneys' fees, costs and disbursements of this action;

vi. Awarding such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, CNW respectfully demands a jury trial of all issues triable to a jury in this action.

CONNOLLY GALLAGHER LLP

*/s/ Arthur G. Connolly, III*
Arthur G. Connolly, III (#2667)
1201 N. Market Street, 20th Floor
Wilmington, DE 19801
(3002) 757-7300
aconnolly@connollygallagher.com

*Attorneys for Plaintiffs Courier NetWork Inc. and Courier NetWork Vietnam Co. Ltd.*

OF COUNSEL

Elyse D. Echtman
STEPTOE LLP
1114 Avenue of the Americas
New York, New York 10036
212-378-7551
eechtman@steptoe.com

Dated: February 21, 2025